IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HEARTLAND ANIMAL CLINIC, P.A.,

Plaintiff,

vs.                                    Case No. 11-2629-JTM

HEARTLAND SPCA ANIMAL MEDICAL
CLINIC, LLC, *et al.*,

Defendants.

MEMORANDUM AND ORDER

This is an action under the Lanham Act, alleging one count of service mark infringement, in

violation of 15 U.S.C. § 15259(a). The plaintiff Heartland Animal Clinic, a small veterinary clinic,

seeks an injunction prohibiting the defendants from marketing their services under the "Heartland"

mark.

On March 16, 2012, the court conducted a hearing on the plaintiff's Motion for Preliminary

Injunction. As stated at the conclusion of the hearing and as further discussed herein, the plaintiff's

motion for injunctive relief is hereby granted.

Plaintiff Heartland Animal Clinic is a small veterinary practice in Overland Park, Kansas.

Employing two licensed veterinarians, a veterinary technician and a handful of office and support

staff, the plaintiff offers a range of veterinary services, including wellness care (vaccines, check-ups

and grooming), dentistry, microchipping, prescriptions, surgical care and overnight boarding. The

plaintiff originally operated under the name Santa Fe Animal Clinic, but changed to its current name in 1995 when another veterinary practice in the area also started using the Santa Fe name.

On June 15, 2011, the non-profit organization Heartland SPCA, LLC, was formed from the merger of two existing animal welfare organizations in the Kansas City area. Heartland SPCA is dedicated to the prevention of cruelty to animals and to providing a full-service, full- circle solution for pets and pet-lovers in Kansas City. At the same time, Heartland SPCA formed two subsidiaries: Heartland SPCA Animal Medical Center, LLC and Heartland SPCA Pet Adoption and Lost Pet Center, LLC. Although legally distinct, the three Heartland SPCA entities are marketed and advertised to the public under a single name: "Heartland SPCA."

The Heartland SPCA organizations collectively provide adoption services, lost pet services, pet in-take services for stray or unwanted pets, affordable veterinary care offered at a range of prices based on financial means, and community outreach programs. Heartland SPCA also investigates calls for pets in need.

The plaintiff alleges that Dr. Jill Sandler, the owner of Heartland Animal Clinic, discovered that the defendants, who are located about four miles from her practice – were marketing their services using the Heartland name. According to the plaintiff, soon afterwards it began to receive calls and visits from persons trying to reach Heartland SPCA. Over the course of the next five months, Plaintiff's employee conducted a log which reflects some 166 attempts by persons or other veterinary organizations trying to contact the defendants.

Dr. Sandler contacted the Defendants' Executive Director, Courtney Thomas, and asked her to please stop using the Heartland name. Thomas declined, citing the $100,000 that the defendants had recently spent on marketing. On August 30, 2011, counsel for Heartland Animal Clinic sent a

2

letter to counsel for the defendants demanding that the defendants stop using the name Heartland. The defendants refused.

Plaintiff Heartland Animal Clinic has an annual budget of $6500 for marketing, which it uses on promotional items, a yard sign, and a yellow pages. In 2012 it began a radio ad campaign for the first time.. Historically, 60% of its customers have learned of its existence through word of mouth.

The defendants operate from a single marketing budget, all operating under the same umbrella description as "Heartland SPCA." The defendants anticipate spending $225,000 on marketing in 2012, and spent a similar amount in 2011.

### Standards for Relief

Injunctive relief requires a showing that the movant has a substantial likelihood of success on the merits and faces irreparable harm absent the relief, harm which is greater than the damage of the relief to the opposing party, and that the preliminary injunction is consistent with the public interest. *Beltronics USA v. Midwest Inventory Distrib.*, 562 F.3d 1067, 1070 (10th Cir. 2009). In an action under the Lanham Act, the plaintiff must show that it owns a valid, protectable mark and that the defendant's mark is so similar to the plaintiff's that it is likely to cause consumer confusion. *Primedia Intertec. v. Tech. Marketing*, 35 F.Supp.2d 809, 815 (D. Kan. 1998).[1]

---

[1] The trademark status of the term "Heartland" has been the focus of at least one prior action. In *Heartland Bank v. Heartland Home Finance*, 335 F.3d 810 (8th Cir. 2003), the Eighth Circuit reversed the decision of the district court granting judgment after a matter of law after excluding, as a discovery sanction, the plaintiff's Confusion Log Summaries. The Court of Appeals held the district court should have considered some lesser sanction, given that without the evidence, "the Bank could not show any case of confusion," and remanded the action for such a determination. 335 F.3d at 817.

The parties dispute, however, whether the plaintiff's request for relief falls into the category of disfavored injunctions, and hence is subject to a heightened burden. The defendants contend that the plaintiff must make "a strong showing both with regard to likelihood of success on the merits and with regard to the balance of the harms" since it is seeking a change in the *status quo* and is essentially seeking all the relief it might otherwise obtain after a full trial. *General Motors v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2009).

As this court recently held in *Planned Parenthood of Kansas v. Brownback*, 799 F.Supp.2d 1218, 1226 (D. Kan. 2011), for purposes of injunctive relief the *status quo* is the "last peaceable uncontested status existing between the parties before the dispute developed," which in this case would be before defendants adopted the "Heartland" mark. On the other hand, the court finds that the plaintiff should be subjected to a heightened burden, because the relief sought by plaintiff here is essentially what it would otherwise obtain at trial.[2]

### 1. Distinctiveness of the "Homeland Animal Clinic Mark"

The first issue in dispute between the parties is whether the mark "Heartland Animal Clinic" represents a descriptive mark which, in the absence of some proof of secondary meaning, receives no trademark protection, or a suggestive mark, which is protected. A descriptive mark "conveys an immediate idea of the ingredients, qualities, or characteristics of the goods [or services]." *Primedia*, 35 F.Supp.2d at 816. Suggestive marks require "imagination, thought, and perception to reach a

---

[2] As discussed below, the court finds that the plaintiff is entitled to relief applying the heightened standard. The court notes that, after initially requesting a trial by jury, the defendant subsequently concurred (Dkt. 22) with the plaintiff's Motion to Strike (Dkt. 18), agreeing that no right to jury trial exists. Accordingly, the matter will be ultimately tried, without any heightened burden, to the court.

conclusion as to the nature of the goods" and are entitled to protection from infringement. *Id.* Standing in opposition to descriptive marks are arbitrary or fanciful marks, which "bear no relationship to the product or service with which they are associated" and receive the most protection. *Id.* at 815.

> The categorization of a mark is a factual question [but] the fact-finder's own perception of the mark is not the object of the inquiry. Rather, the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is.

*Donchez v. Coors Brewing*, 392 F.3d 1211, 1216 (10th Cir. 2004) (citations and internal quotations omitted).

The defendants correctly cite a leading authority for the proposition that geographic names are normally deemed unprotected in the absence of secondary meaning. 2 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 14.1, at (2011) ("[t]erms that are descriptive of the geographic location or origin of goods and services are regarded by the law as not being 'inherently distinctive' marks'"). The defendants stress that the dictionary meaning[3] of "Heartland" is merely "the central geographical region of the United States," which they take to mean "Kansas, Missouri and surrounding areas. (Dkt. 36, at 7). Accordingly, the defendants contend that the plaintiff's mark "is geographically descriptive and therefore unprotectable." (*Id.*)

The plaintiff notes that the defendants give a truncated version of Merriam-Webster, which states in full that the "Heartland" is ""the central geographical region of the United States *in which mainstream values or traditional values predominate*." (Emphasis added). Thus, the plaintiff does not argue that "Heartland" is a geographic term that is protectible because it is a geographically

---

[3] Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/heartland.

5

descriptive term which has acquired a secondary meaning; it argues that the term is not descriptive but suggestive. (Dkt. 30, at 8).

The plaintiff makes this argument in two steps. First, it notes that the term is not tied to any specific geographical area, noting examples of businesses named "Heartland" in Seattle, Washington and Winslow Maine. The PBS show *America's Heartland* is filmed in all 50 states, the series opening with the observation that "America's heartland is more than a place; it's a state of mind." And, citing a wikipedia entry, it notes that the Heartland Rock genre, was founded by New Jersey native Bruce Springsteen.

Second, the plaintiff argues that "Heartland" conveys values beyond any location, but "a set of values; integrity, and appreciation for hard work, community, a sense of home." (Dkt. 30, at 8). In particular, it notes the song *Heartland* by George Strait, in which he sings:

> When you hear twin fiddles and a steel guitar,
> You're listening to the sound of the American heart.
> And Opry music on a Saturday night
> Brings a smile to your face and a tear to your eye.
>
> Sing a song about the heartland,
> The only place I feel at home.
> Sing about the way a good man
> Works until the daylight's gone.
> Sing the rain on the roof on a summer night
> Where they still know wrong from right.
>
> Sing a song about the heartland.
> Sing a song about my life.

It couples this with the results of an internet consumer survey conducted by Op4G, a company that conducts marketing surveys. The five-question survey was answered by 600 persons, which, plaintiff suggests resulted in a confidence interval of plus or minus four percentage points

and a confidence level of 95 percent.

Question 2 of the survey asked for their reaction to the statement, "When people refer to 'The Heartland', they are referring to more than a geographic region." The heavy majority of the respondents either Strongly Agreed (238 or 40%) or somewhat agreed (220, or 37%). Only 8% (49) somewhat disagreed and 3% (16) strongly disagreed. Thirteen percent (77) of the respondents neither agreed nor disagreed.

Question 3 asked, "If a company in a Midwestern city opened with the name 'Heartland Child Care', what would it be trying to communicate?" and asked respondents to give the "best answer."

| Response | Respondents | % |
|---|---|---|
| Traditional Values: | 301 | 50 |
| Dependability: | 70 | 12 |
| Location: | 68 | 11 |
| Honesty: | 61 | 10 |
| Hard Working: | 53 | 9 |
| Variety of Services: | 40 | 7 |
| Size: | 7 | 1 |

Question 4 was open-ended, and asked "What does the term Heartland mean to you?" The plaintiff notes that the word "values" is mentioned 110 times by respondents, "hard-working" 101 times, and "honest" 89 times. The plaintiff also notes some of the full answers provided, which included:

A location or place that is home to you no matter where you go in life.

Something or someone with values, respect, accountability.

It brings images of home, family, good neighbors, a good place to live.

Heartland means a place where the things that really matter in life - God, family, friends, honor, respect, dignity, integrity, love - are the things that are prioritized. It's a safe place where you can trust people to really care and to do their best to show insiders and outsiders kindness.

The heart of America, the lifeblood of the country. Where people believe in honest, hard work and the values of family and community.

Home, family, loving one another, church, God and overall traditional values

Means a different attitude toward work ethic and relationship with people

In its Response, the defendants acknowledge that "Heartland" might have "another ancillary meaning," but suggest that this is irrelevant because the term is primarily geographically descriptive. (Dkt. 36, at 8). In support of this argument, the defendants rely in particular on *Midwest Research Inst. v. S & B Promotions*, 677 F. Supp. 1007 (W.D. Mo. 1988), where the court held that the word "Midwest" was geographically descriptive and unprotectable absent secondary meaning. But "Midwest" is not a term fraught with the sort of values which attach to "Heartland." The plaintiff in *Midwest Research* never contended the term was suggestive, only that term was protected through secondary meaning.

The defendants also rely on *Burke-Parsons-Bowlby v. Appalachian Log Homes*, 871 F.2d 590, 595 (6th Cir. 1989), where the Sixth Circuit held that the mark "Appalachian Log Structures" was a geographic description and not protectible. The court concluded that "[w]hen a geographic name is used on goods, it does not represent a single source but refers to the area in which the goods originated. A 'goods/place association' by the public is therefore presumed." *Id*. at 596 (citing *In*

*re Nantucket*, 677 F.2d 95, 99 (U.S.Ct.C. & P.A.1982)). Notably, the court did not discuss whether the term might be suggestive, but analyzed the term only within the extremes of descriptive or arbitrary. *See* 871 F.2d at 594-95. The parties apparently made no attempt to contend that "Appalachian" might have acquired colloquial values making the term suggestive in nature. The court concluded simply that there was "substantial evidence supporting the District Court's conclusion," and rejected the plaintiff's contention that the decision was clearly erroneous. *Id.* at 595, 596.

The defendants also present three additional arguments. First, they suggest that internet and telephone book searches demonstrate that the term "heartland" is not tied to the plaintiff in any local market. Specifically, it submits the results of a Google Maps search showing over 100 businesses using the term "heartland" in the Kansas City area, and a search from the Kansas City telephone book showing over 150 business entries beginning with the word "Heartland." Accordingly, the defendants contend, the term "heartland" would not indicate to the typical consumer the existence of any single source of services.

In addressing the distinction between descriptive and suggestive marks, one leading commentator has noted that courts may appropriately consider the use of the term by others:

> ***Use by the Proponent and Others.***   A useful way to test whether a designation is descriptive or suggestive is to determine the extent to which other sellers have used the designation *on similar goods and services*. If others are in fact using the term to describe their goods or services, an inference of descriptiveness can be drawn.

2 MCCARTHY ON TRADEMARKS, at § 11:69 (emphasis added). It may be noted here that defendants' Exhibit 1, which details the results of the defendants' Google search, and Exhibit 2, taken from the Kansas City telephone book, shows only one "Heartland" apparently connected with veterinary

services, namely the plaintiff, Heartland Animal Clinic.

Second, citing *Primedia Intertec. Corp. v. Tech. Marketing Corp.*, 35 F. Supp. 2d 809, 814 (D. Kan. 1998)., the defendants contend that, even if the term "heartland" has become loaded with values beyond its use as a geographic description, such a recitation of qualities would again be merely descriptive, and thus not protectible. In *Primedia*, the court was actually quoting the general definition of a descriptive trademark as one which "conveys an immediate idea of the ingredients, qualities or characteristic of the goods." 35 F.Supp.2d at 814 (quoting *Beer Nuts, Inc. v. Clover Club Foods*, 711 F.2d 934, 939 n. 5 (10th Cir. 1983) (quoting *Abercrombie & Fitch v. Hunting World*, 537 F.2d 4, 11 (2d Cir. 1976))) (internal quotation marks omitted).

The critical term, of course, is *immediate*. The same case (again quoting the same underlying authorities) noted that suggestive marks, which may receive protection, are those which "require imagination thought and perception to reach a conclusion as to the nature of the goods." 35 F.Supp.2d at 814 (internal quotations omitted). That is precisely the argument the plaintiff makes, that the term "heartland" is associated with values such as "integrity, an appreciation for hard work, community, a sense of home" which the consumer applies to the services only by means of inference and suggestion.

Finally, with respect to the evidence showing that the term "heartland" has acquired an aura of values in addition to its geographical meaning, the defendants dismiss both the "obscure country song" cited by plaintiff as well as its survey, which it suggests is unsound and unreliable, but the only specific rationale advance for this conclusion in their brief is the complaint that the survey should have asked specifically about "Heartland Animal Clinic," as opposed to the general understanding of the term "heartland." (Dkt. 36, at 10-11).

The court finds that the plaintiff's survey is not automatically irrelevant simply because it did not ask about "Heartland Animal Clinic." The defendant correctly notes that a claimed trademark "should be considered in its entirety," *Estate of P.D. Beckwith, Inc., v. Commissioner of Patents*, 252 U.S. 538, 546 (1920), but this hardly means that evidence such as that offered by the plaintiff is automatically inadmissible simply because it does not directly address the ultimate question of law before the court. The court finds that the study was conducted according to standard practice within the marketing industry, appears to be generally reliable, and was properly submitted as evidence.

Further, the court finds that the survey provides substantial support for concluding that the term "Heartland" is generally understood to be less of a geographic term, and more of a term associated with certain positive values such as hard work. In their cross-examination of the author of the study, the defendants demonstrated that some of his codings for the responses to the open-ended question were subjective in nature, and upon further review might be given a different characterization.

These changes would affect only a small portion of the reponses, however, and a thorough review indicates that the ultimate conclusion remains valid: by a substantial margin, consumers tend to associate the term "Heartland" with values rather than geography.

Finally, with respect to the George Strait's *Heartland*, it cannot be accurately described as obscure. The song was the Number 1 song on *Billboard Magazine*'s Country Music Chart for 20 weeks in 1993.[4]

Neither party devotes much attention to the category of suggestive marks. The Tenth Circuit reviewed the intermediate nature of this category in *Educational Dev. Corp. v. Economy Co.*, 562

---

[4] http://www.billboard.com/charts#/song/george-strait/heartland/474704.

F.2d 26, 29 (10th Cir. 1977), noting:

> The suggestive class was judicially developed to fill the need for protection of marks that were neither exactly descriptive nor fanciful. The distinction between descriptive and suggestive marks is difficult. The determination is often based on intuitive reactions rather than analytical reasoning. [S]uggestive terms are those which require the buyer to use thought, imagination, or perception to connect the mark with the goods. Descriptive terms are those which directly convey to the buyer the ingredients, qualities, or characteristics of the product.

The same authority otherwise cited by the defendants recognizes the middle ground nature

of suggestive marks — and its potential ambiguity:

> The distinctiveness of a mark cannot be determined in the abstract, but only by reference to the goods or services which the mark is used. For example, the mark BRILLIANT may be "descriptive" on diamonds, "suggestive" on furniture polish, and "arbitrary" on canned applesauce. The exact position of the line between descriptive and suggestive marks is almost impossible to define in the abstract. As one court has stated, "The line of demarcation may not be easy to draw, but it exists." In speaking of the descriptive-suggestive distinction, Judge learned Hand could be no more definite than to state: " it is quite impossible to get any rule out of the cases beyond this:  That the validity of the mark ends where suggestion ends and description begins."
>
> ....
>
> The terms "descriptive" and "suggestive" are not mutually exclusive. There is some description in any suggestion or the suggestive process will not take place.

2 McCarthy on Trademarks, § 11:64.

The same authority recognizes some additional factors to consider applying the imagination

test for suggestiveness of a mark:

> ***How Direct and Immediate is the Link Between Mark and the Nature of the Product or Service?***  Under the imagination test, the question is how immediate and direct is the thought process to go from the designation to some characteristic of the product. If one must exercise "mature thought or follow a multistage reasoning process" to determine attributes of the product or service, then the term is suggestive, not descriptive. For example, the Second Circuit held that GUNG-HO was merely suggestive, not directly descriptive, of a cartoon-based toy action doll of a hard-bitten

> marine sergeant because "a certain amount of creative imagination is required" of the child to intuit the specific attributes of this particular character from its mark.
>
> For example, to receive any information about the nature of bus services from the word "greyhound" one must know what a "greyhound" is and what its attributes are before the mind can make any connection between the word and any alleged characteristics of a bus service.

2 MCCARTHY ON TRADEMARKS, § 11:67.

The court finds that the plaintiff has demonstrated that the Heartland mark for veterinary services is a protectible suggestive mark. The ordinary consumer must make a mental leap of some size to associate the values associated with the term "heartland" to the provision of veterinary services. The term is not used primarily as a geographic description, but is valued for its association with positive characteristics such as hard work, honesty, and — in particular — customary, homespun, "traditional values."

### 2. Likelihood of Confusion

In the context of a trademark action, a likelihood of confusion will be deemed to exist where "consumers make an incorrect mental association between the involved commercial products or their producers." *Jordache Enter., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir. 1987). "In determining whether marks are likely to cause confusion, the Tenth Circuit has set forth the following list of factors that the Court must use:  (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) the relation in use and the manner of marketing between the goods or service marketed by competing parties; (d) the degree of care likely to be exercised by purchasers; (e) evidence of actual confusion; and (f) the strength or weakness of

the marks." *Primedia*, 35 F. Supp. 2d at 818 (citing *First Savings Bank, FSB v. First Bank System, Inc.*, 101 F.3d 645, 652 (10th Cir. 1996)). The court must consider all six factors, as no single factor is determinative. *Team Tires Plus, Ltd. v. Tires Plus*, 394 F.3d 831, 833 (10th Cir. 2005).

**A. Similarity**

The distinctiveness of a mark is derived from the mark as a whole, and accordingly the mark is examined in its entirely rather than its constituent parts. *Estate of P.D. Beckwith v. Comm'r of Patents*, 252 U.S. 538, 545-46 (1919); *The Golf Warehouse, LLC v. Golfers' Warehouse, Inc.*, 142 F. Supp. 2d 1307, 1309 (D. Kan. 2001). This includes an examination of the design, fonts, and logos associated with the mark. *Universal Money Centers v. American Tel. & Tel.*, 22 F.3d 1527 (10th Cir. 1994). Courts should examine the mark as actually used in the marketplace, including sight, sound, and meaning. *Universal Money Centers v. American Tel. & Tel.*, 22 F.3d 1527, 1530-31 (10th Cir. 1994).

The plaintiff has advertised itself using combination of the "Heartland Animal Clinic" mark, coupled with a silhouette of a dog and cat:



The defendants have marketed their services under using logos similar to this:



The defendants stress the differences in these marks as to font, the use of color, and the use of the acronym "SPCA." At the same time, much of the defendants' marketing has been through electronic means, including their use of radio advertisements, which may diminish some of the distinctive visual aspects of the marks, with many consumers simply retaining the term "Heartland" as a course of animal care services. Moreover, while some aspects of the marks are distinct, the marks both show a dog and cat in profile, and use the term "Heartland" as the most prominent word.

**B. Intent**

"The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache Enterprises v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987) (quoting *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir.1984)). There is no evidence that the defendants intentionally adopted their mark with an intent to pass their services off as those of the plaintiff.

15

At the same time, however, the court notes that defendants made no effort to conduct inquiry as to existing users of the "Heartland" brand within the local market, since they were the only SPCA in the region. The defendants, however, are not simply an anti-cruelty organization, but an umbrella of animal care services providers — including veterinary care — marketed under the same general logo.

## C. Marketing

The defendants contend that there is little overlap between the marketing used by the parties. The defendants use direct mail, e-mail, social media, and advertisements on television and radio. The plaintiff, according to defendants restricts its marketing to the Yellow Pages, Yahoo Listings, magnetic logos on employee cars, a local Fall Festival Parade, and a radio program fundraising campaign. In addition to veterinary services, the defendants stress that they provide adoption and cruelty-prevention services. Further, they emphasize low cost veterinary services, with 60% of their customers falling below the federal poverty line.

While this is a substantial number, and of course reflects commendable charitable intent, the other side of the coin is that a non-negligible portion of the defendant's clients include persons above the poverty line, customers who might otherwise seek services from the plaintiff.

## D. Degree of Care

Where a typical customer may be expected to exercise small care in avoiding confusion as the source of a product — such an impulse purchase of snack food — the likelihood of consumer

confusion increases. *See Beer Nuts v. Clover Club Foods*, 711 F.2d 934, 941 (10th Cir. 1983). The defendants note that one court has concluded, in a trademark action over veterinary services, that "reasonably attentive pet owners should be particularly attentive in selecting a veterinarian for their family pets," thereby lessening the likelihood of consumer confusion. *Cohn v. Petsmart, Inc*., 281 F.3d 837, 843 (9th Cir. 2002).

But *Cohn* did not ground its observation on any evidence. Instead, the court simply cited its earlier decision in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cri. 1979), *abrogation in part on other gds. recognized by Mattel, Inc. v. Walking Mountain Prods*., 353 F.3d 792, 810 n. 19 (9th Cir.2003). In *AMF*, the court observed:

> In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous. When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely.

599 F.2d at 353 (citations omitted). The plaintiff and the defendant "vigorously contested" the sophistication of the relevant market, but the court of appeals upheld as "amply supported by the record" the district court's decision favoring the defendant on the sophistication of purchasers of "high quality" watercraft. *Id.* "Common sense and the evidence indicate that this is not the type of purchase made on 'general impressions.'" *Id.*

In contrast, the defendant has supplied no evidence relating to the sophistication to animal care consumers in the relevant market. Without slighting the affection individual owners may have for their pets, the court notes that the defendants' marketing is not directed, as in *AMF*, at buyers who have "expertise in the field" for services which are "expensive." Indeed, precisely the opposite

17

is true — the defendants are marketing services to relatively unsophisticated purchasers of "low cost" veterinary services.

**E. Actual Confusion**

This is the only factor actually addressed by the plaintiff, which correctly notes in its Reply that actual confusion has been deemed "the best evidence of the likelihood of confusion." *Primedia*, 35 F.Supp.2d at 821 (citing *Universal Money Centers*, 22 F.3d at 1534).See also 4 MCCARTHY ON TRADEMARKS, § 23:13 at 23-111 ("[a]ny evidence of actual confusion is strong proof of the fact of a likelihood of confusion"). However, as noted earlier, no one factor is deemed dispositive in the likelihood of confusion analysis.

In support of their argument that the court should give minimal significance to the call log compiled by the plaintiff, the defendants cite several cases which found only weak evidence of actual confusion, in particular *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002). These cases are factually distinct, and their relevance here is limited.

In *Therma-Scan*, the plaintiff cited 18 misdirected e-mail inquiries. After first noting only six of these e-mails reflected some potential confusion by domestic purchasers, the court stressed the evidence was of limited value on multiple levels:

> First, the six misdirected e-mail messages become much less probative of actual confusion when measured against the number of people who have purchased Thermoscan's thermometers and who have requested information about them. Thermoscan sold 3,200,000 ear thermometers between January 1, 1997 and July 31, 2000, and it receives, on average, 11,000 calls each month on its toll-free consumer-information telephone number. Six confused customers is legally insignificant in light of the scale of Thermoscan's operations.
>
> Second, the fact that the confusion occurred in e-mail messages raises the

possibility that consumers sent the inquiries about the thermometers to TSI rather than to Thermoscan because they were inattentive or careless, as opposed to being actually confused. A consumer using a popular Internet search engine to locate an e-mail address for Thermoscan could find TSI's website if he or she mistakenly conducted a search for "thermascan" rather than for "thermoscan." The fact that TSI does not advertise increases the likelihood that the people who sent the e-mail messages to TSI were inattentive or careless when attempting to find the e-mail address for Thermoscan, rather than confused about the source of the ear thermometers.

Finally, all of the instances which allegedly support a finding of actual confusion occurred between November 20, 1998, and July 26, 2000. The absence of any evidence of confusion prior to this time period, despite the coexistence of the goods and services since 1990, supports a conclusion that consumers have not been confused about whether TSI is affiliated with Thermoscan. Moreover, the lack of any indication that consumers were confused prior to November of 1998 further bolsters the likelihood that the e-mail messages were due to carelessness rather than actual confusion.

295 F.3d at 635-36 (citations omitted). The court cited its earlier decision in *S.C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 141 (6th Cir.1959), where it held that "[t]he owner of a trademark is not entitled to a *guarantee* against confusion in the minds of careless and indifferent buyers, and *merely occasional cases of confusion or thoughtless error by very inattentive purchasers* are of very little significance in trademark and unfair competition cases." (Citation omitted, emphasis added).

Similarly in *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir.1996), another case cited by the defendants, the court found that a plaintiff's receipt of "several isolated instances" of defendant's mail and phone calls "was *de minimis* and [served] to show inattentiveness on the part of the caller or sender rather than actual confusion," but the opinion of the court, other than referring to "the vague evidence of misdirected phone calls and mail," fails to indicate either the number or content of these inquiries.

Such cases simply reflect the view that

19

[e]vidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*. Evidence of actual confusion of a very limited scope may be dismissed as *de minimis*: Probable confusion cannot be shown by pointing out at at someplace, at some time, some one made a false identification....

....

Evidence of the number of instances of actual confusion must be placed against the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight....

....

**However, given the proper factual setting, even just a few instances of actual confusion can provide very persuasive of how and why confusion can occur.**

4 MCCARTHY ON TRADEMARKS, § 23:14 (emphasis added).

In contrast to *Therma-Scan,* the call log presented to the court by plaintiffs show not a few "merely occasional" inquiries, but dozens of instances of consumers apparently confusing Heartland Animal Clinic and Heartland SPCA. Further, again in contrast to *Therma-Scan*, these confused inquiries arose almost immediately upon the defendant's adoption of the Heartland SPCA mark.

The court finds that the call log provides strong evidence of actual confusion.[5] The court also

---

[5] Allegations of customer confusion may sometimes take the form of hearsay. In *Vitek Systems v Abbott Laboratories*, 675 F.2d 190, 193 (8th Cir. 1982), the court noted the plaintiff's evidence of confusion took the form of "witnesses [who] testified, in effect, that customers had told them that they were confused by the similarity of the marks. Such testimony was hearsay in nature and the district court properly gave it little weight." The call log submitted by plaintiff here, in contrast, generally is free of such truth-of-the-matter hearsay, and instead reflects simple notations reflecting callers seeking services from Heartland SPCA. *See Jordache*, 828 F.2d at 1487 (evidence of calls was admissible "to show the then existing state of mind" of the callers); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (evidence of confused inquiries was not hearsay as it was not offered to prove the truth of the matter asserted). *See* 4 MCCARTHY ON TRADEMARKS, § 23:15 (recognizing majority holding customer confusion

finds unpersuasive the defendants' attempts to minimize the importance of these calls.

In their brief, the defendants stress that some of the calls reflect simple customer inquiries, asking if the plaintiff was Heartland SPCA. As the court noted in *Jordache* with respect to such evidence,

> the district court correctly gave it little weight. McCarthy advises, "The better view would seem to be that while [customer] enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion." 2 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 23:2(B) at 54 (2d ed. 1984) [now 3 MCCARTHY ON TRADEMARKS § 23:16, at 23-128 (2011)]. We hold that even when combined with other evidence inquiries to the plaintiff about the source of a product are of comparatively little value.

*Id.* However, these calls — which reflect actual inquiries or otherwise reflecting caution or doubt by the caller as to existence of alternative suppliers — are relatively few. In contrast, the plaintiff was faced with a deluge of calls seeking services from the defendants, either by name or by proxy, seeking the provision of "low cost" veterinary services.

Similarly, at the hearing of this matter, defendants placed particular stress on the last paragraph of 4 MCCARTHY ON TRADEMARKS, § 23:13, which begins with the general observation that "[s]ometimes what appears at first glance to be evidence of confusion is merely evidence of consumer error not related to name confusion." Again, however, this observation is premised on a series of cases which are factually inapposite here. *Id*. at 23-117, n. 13. In the leading cited authority, *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576 (2nd Cir. 1991), the court discounted evidence from the plaintiff's call log, both because the content of the calls failed to show actual consumer confusion, and because the evidence showed that the calls stopped with the publication

---

is not hearsay).

of a new telephone book.[6]

*Lang* is of little relevance here, as the plaintiff's call log shows dozens of instances of genuine consumer confusion as to the source of the requested veterinary services. *See Beacon Mutual Ins. v. OneBeacon Ins.*, 376 F.Supp.2d 251, 263 n. 7 (D.R.I. 2005) (finding *Lang* inapplicable and plaintiff's call log evidence relevant, where calls showed genuine confusion as to product source). Moreover, the defendants' suggestion that such consumer confusion will stop once Heartland SPC is listed in the telephone book finds no support in the evidence. It is a mere hypothetical, made certainly more doubtful in the present age, over two decades after *Lang*, where telephone books have been largely displaced by other forms of marketing. Finally, if anything, the timing of the calls show a strong inference of actual confusion, since this avalanche of calls began shortly after the defendants commenced their heavy electronic marketing campaign, and has shown little sign of abatement.

**F. Mark Strength**

"A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *First Sav. Bank v. First Bank System*, 101 F.3d 645, 653 (10th Cir. 1996). The court finds that this factor is neutral. The term "heartland" is indeed used by many other businesses in the Kansas City area, but the evidence fails to show any use in the context of veterinary services other than by the plaintiff and the defendants.

The court concludes that the plaintiff has presented strong evidence of likely confusion.

---

[6] The other authorities cited in the treatise have even less relevance. The first, *Duluth News-Tribune*, 84 F.3d 1093, has already been discussed. In the second, *Bioglan Inc., v. Bioglan Laboratories*, 44 U.S.P.Q.2d 1662, 1669 (C.D. Cal. 1997), the court found that the plaintiff's evidence — *three* misplaced telephone calls — was insufficient to show actual confusion.

Immediately upon the defendants' adoption of the "heartland" mark, the plaintiff has been deluged with callers who have confused the plaintiff for the defendants. Only through additional, in some cases lengthy inquiry, have the plaintiff's employees been able to tell that the callers are seeking "low cost" services from Heartland SPCA. Frequently, callers are angry, upset with the plaintiff for the quality of services actually supplied by the defendants. Even allowing for the relatively few calls reflecting inquiring or lazy customers simply seeking directions, there remains a large majority of calls reflecting actual confusion among veterinary services customers. The additional factors are either neutral in effect, or only slightly favor of the defendant. Overall, the court finds that the plaintiff has presented compelling evidence of a likelihood of confusion.

### C. Elements of Injunctive Relief

The defendants argue that even if the plaintiff made out a colorable basis for concluding that it would succeed on the merits, the court should still deny the request for injunctive relief because of the remaining elements for such relief are not present. Specifically, it argues that plaintiff will not suffer irreparable injury, as it has failed to present any evidence of the loss of business or good will, that an injunction would cause significantly more harm to the defendants, given their substantial effort to market themselves under the "Heartland SPCA" mark, and that the public interest is not advanced by an injunction. Finally, defendants request a bond in the amount of $420,000 in the event the court grants an injunction, in order to cover its costs of re-branding in the event such an injunction were later overturned.

The court finds that an injunction should issue. First, given the size of the defendant's ongoing marketing campaign, the plaintiff faces a serious threat of being displaced in the market,

notwithstanding its right to the Heartland mark. Further, the plaintiff has presented credible evidence of injury to its good will, in the form of injury to its reputation from aggrieved but confused customers of the defendants. Finally, infringement of a trademark by its nature contributes to irreparable injury to its owner. *See, e.g., Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 858 (7th Cir. 1982).

The court recognizes that an injunction may work a substantial hardship to defendants, but measures this against the injury to the plaintiff and the plaintiff's right to the Heartland mark, the defendants' failure to exercise due caution prior to their adoption of the Heartland as a part of their mark, and the bond which the court will require the plaintiff to post. The court also finds that an injunction will serve the public interest by reducing confusion as to the provision of veterinary services.

The court will require the plaintiff to post a bond as surety in an amount equivalent to one year's marketing budget for the defendants, $225,000.

The plaintiff's Motion for Preliminary Injunction (Dkt. 30) is hereby granted, and the defendants are enjoined from using the name "Heartland" to market veterinary services in the Kansas City Metropolitan Area. As noted at the conclusion of the hearing, the court temporarily stays the effect of the this injunction. However, in the absence of further direction by the court, the injunction shall take full and immediate effect, without further notice, on April 16, 2012.

IT IS SO ORDERED, this 20th day of March, 2012.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

24